United States District Court
Southern District of Texas

**ENTERED**

April 11, 2023

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JONATHAN GOLATT, | § | |
| (TDCJ # 02292996), | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-18-1333 |
| | § | |
| J.W. TYRON, Chief of Police, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

State inmate Jonathan Golatt (TDCJ #02292996), proceeding *pro se* and *in forma pauperis*, filed an amended/supplemental Prisoner's Civil Rights Complaint under 42 U.S.C. § 1983, alleging that three officers from the City of Deer Park Police Department violated his civil rights in connection with his arrest on July 25, 2016. (Dkt. 35). The officers answered the complaint, (Dkt. 50), and then filed a joint motion for summary judgment, supported by extensive exhibits. (Dkt. 59). Golatt filed a response to the motion, (Dkt. 68), and the officers filed a reply. (Dkt. 69). Based on the motion and responses, the exhibits, all matters of record, and the law, the Court grants the officers' motion for summary judgment and dismisses Golatt's complaint for the reasons explained below.

## I.   **BACKGROUND**

After lengthy proceedings not relevant to the issues currently before the Court,

Golatt filed an amended/supplemental civil rights complaint in which he sued three

officers from the Deer Park Police Department: Sergeant James W. Tryon, Detective

Mason Moore, and Lieutenant Chris Brown.[1]   (Dkt. 35).   At the Court's request,

Golatt filed a more definite statement of his claims.   (Dkt. 37).

In his pleadings, Golatt alleges that on July 25, 2016, he was staying at his

mother's apartment while she was out of town.   (Dkts. 35, p. 4; 37, p. 4).   He alleges

that he left the apartment and was walking to a nearby Starbuck's when he was

approached by three officers who ordered him to stop and speak with them.   (Dkt.

37, p. 1).   Golatt told the officers that he did not want to talk to them unless they had

a warrant and he tried to keep walking, but Lieutenant Brown placed "one hand in

my chest and the other hand on his weapon," and said that they did not need a warrant

and that Golatt needed to sit down and speak with them.   (*Id.*).   Golatt complied at

that point.   (*Id.*).

The officers asked Golatt whether he knew someone named "Kendall Lee."

(*Id.* at 2).   Golatt denied knowing anyone by that name.   (*Id.*).   The officers told

---

[1]Golatt also named Deer Park Chief of Police Gregory L. Grigg as a defendant.
(Dkt. 35).  The Court previously dismissed Chief Grigg because Golatt failed to allege that
he was personally involved with any of the events underlying Golatt's claims.  (Dkt. 43).

Golatt that Lee had been seen the night before leaving the apartment that Golatt just left. (*Id.*). Lee was arrested a short time later with illegal drugs on him, which Lee said he had obtained from the apartment. (*Id.*). After learning this information, Golatt told the officers that Lee must be a person he knew as "Big Black." (*Id.*). Golatt admitted that "Big Black" had been to the apartment the night before and had left a black bag with Golatt, saying he would return for it shortly. (*Id.*). Lee never returned, and the bag was still in the apartment. (*Id.*).

According to Golatt, the officers asked him for consent to enter the apartment and retrieve the bag Lee had left. (*Id.*). Golatt alleges that he told them that he could not give consent because the apartment was his mother's. (*Id.*). He alleges that the officers then used "intimidation and threats to get a warrant" to attempt to gain consent. (*Id.*). When Golatt continued to refuse to consent, the officers handcuffed him, put him in the back of a police vehicle, and drove him back to the apartment. (*Id.* at 2-3). During the drive, Sergeant Tryon turned to Golatt, "placed his hands/hand around the base of my neck," and told Golatt not to give the officers any trouble and to just let them in. (*Id.* at 3).

Golatt alleges that when he arrived at the apartment with the officers, he initially refused to open the door. (*Id.*). He alleges that the officers then placed their hands on their weapons and ordered him to open the door. (*Id.*). Golatt complied at

3

that point "out of fear." (*Id.*).

Once inside the apartment, Golatt pointed out the bag left by Lee, in which the officers found large amounts of methamphetamine, hydrocodone, marijuana, cocaine, and heroin. (*Id.* at 3, 5). Golatt also pointed out a handgun he said was left by Lee. (*Id.* at 5). Golatt alleges that during an ensuing search of the apartment, the officers found and confiscated more than $10,000 in cash. (Dkt. 35, p. 4).

According to Golatt, after the officers had secured the bag, the handgun, and the cash, they asked him to sign a form consenting to the search. (Dkt. 37, p. 3). Golatt alleges that he said, "Hell no, this is illegal and I know it." (*Id.*). Golatt alleges that Sergeant Tryon told him that if he did not sign the form, he would "go away for a long time," but that if he signed, the officers would "go light" based on his cooperation. (*Id.*). Golatt still refused to sign the form and instead he wrote "not without a lawyer" at the bottom of the form. (*Id.*). Golatt alleges that the officers then removed the handcuffs, which had been securing his hands in front of his body, and resecured them with his hands behind his back. (*Id.*).

Based on the items found in the apartment, a grand jury indicted Golatt for possession with intent to deliver controlled substances in Harris County Cause No. 1518091. (*Id.* at 8). While that case was pending, a separate grand jury indicted Golatt on two counts of aggravated sexual assault on a child under the age of 14 in

Harris County Cause No. 1554335—a cause based on events completely unrelated to the possession cause. (Dkt. 35. p. 8). After Golatt was convicted of the aggravated sexual assaults, the possession charge in Cause No. 1518091 was dismissed. (*Id.* at 8, 10). In his amended/supplemental complaint, Golatt claims that his constitutional rights were violated because he was subjected to an illegal arrest, the use of excessive force, an illegal search, and the theft of cash from the apartment during the events leading to the possession charge.

The officers answered Golatt's amended/supplemental complaint and filed a motion for summary judgment. (Dkts. 50, 59). In support of their motion, they each filed an affidavit, testifying to their recollection of the events. (Dkts. 59-1, 59-2, 59-3). In his affidavit, Sergeant Tryon stated that on July 24, 2016, Deer Park Police officers arrested Kendall Lee and Gina Vasquez for possession of narcotics after they left an apartment at 4918 Academy Lane in Deer Park. (Dkt. 59-1, p. 1). Sergeant Tryon interviewed Vasquez, who said that Lee, who was also known as "Big Black," used that apartment as a stash house and kept a large amount of money and cocaine and other drugs there. (*Id.*). She said that when she and Lee went to the apartment, she saw drugs and other contraband in the possession of a black male who appeared to be living there. (*Id.* at 1-2). She described the black male, the apartment location, and the interior of the apartment. (*Id.*). The next day, Sergeant

Tryon accompanied Vasquez to the apartment complex, where she identified the specific apartment that was the stash house. (*Id.* at 2).

Detective Moore began surveillance of the apartment the same morning. (*Id.*). Late in the morning, Detective Moore saw a black male matching the description Vasquez had given leave the apartment. (*Id.*). Detective Moore notified Lieutenant Brown and Sergeant Tryon, and he then stopped the black male to interview him. (*Id.* at 2). Detective Brown and Sergeant Tryon arrived shortly thereafter, and the man identified himself as Golatt. (*Id.*). When the officers asked about Lee, Golatt responded that he did not know anyone named "Kendall Lee," but "Big Black" had left a gun and a black bag with unknown contents at the apartment the day before. (*Id.*). Golatt told the officers that Lee paid him to hold the property, so he did not ask questions. (*Id.*).

When the officers told Golatt of Lee's arrest the day before, Golatt "agreed to allow us to retrieve the black bag of presumed contraband because he did not want it in his apartment." (*Id.* at 3). Golatt rode back to the apartment in the front seat of Lieutenant Brown's police vehicle while Sergeant Tryon rode in the back seat. (*Id.*). Golatt was not under arrest and was not handcuffed. (*Id.*). Sergeant Tryon denies hitting, injuring, or threatening Golatt with any physical force at any time. (*Id.*).

Detective Moore alleges in his affidavit that he was assigned to conduct

6

surveillance on a specific apartment on July 25, 2016, based on information from two recent arrestees that the apartment was being used as a stash house for drugs. (Dkt. 59-2, p. 1). While surveilling the apartment, he saw a black male matching the description given by one of the arrestees leave the apartment and walk in the direction of a local Starbuck's. (*Id.* at 1-2). Detective Moore approached the man and engaged him in a voluntary conversation while waiting for Lieutenant Brown and Sergeant Tryon to arrive. (*Id.* at 2). He did not physically detain the man or tell him that he was not free to leave. (*Id.*).

When Lieutenant Brown and Sergeant Tryon arrived, the man—who identified himself as Golatt—admitted that a man he knew as "Big Black" had left a gun and a black bag with unknown contents at the apartment the night before. (*Id.*). After the officers told Golatt of Lee's arrest, Golatt agreed to allow the officers to enter his apartment to retrieve the black bag. (*Id.*). At the door to the apartment, Detective Moore heard Golatt say, "Now I am letting y'all in here. You know that, right?" (*Id.*). Detective Moore understood this to be consent to enter the apartment. (*Id.* at 2-3).

Detective Moore states that he and the other officers recovered $3,476.01 in cash from the apartment. (*Id.* at 3). He was not aware of any other cash being found or confiscated. (*Id.*). Detective Moore also states that he did not threaten Golatt,

7

strike him, injure him, or use any force against him at any time during the encounter, nor did he see any of the other officers do so. (*Id.* at 2-3).

Lieutenant Brown states in his affidavit that he and Sergeant Tryon responded to Detective Moore's call concerning the man who had left the apartment where drugs had allegedly been left the night before. (Dkt. 59-3, p. 1). When Lieutenant Brown arrived at the scene, Detective Moore was speaking with Golatt in what appeared to be a consensual encounter. (*Id.* at 2). Golatt was not handcuffed, and he was not refusing to talk or requesting to leave. (*Id.*). After being told that Lee had been arrested the night before for drug possession, Golatt agreed to allow the officers to enter his apartment and retrieve the bag that Lee had left there. (*Id.*). Golatt rode with Lieutenant Brown back to the apartment, and he was not under arrest nor was he handcuffed. (*Id.*). Once at the apartment, Lieutenant Brown also heard Golatt say, "Now I am letting y'all in here. You know that, right," which he understood to be consent to enter the apartment. (*Id.* at 3).

Lieutenant Brown was not aware of any cash seized from the apartment other than the $3,476.01 that was delivered to the Assistant District Attorney for forfeiture. (*Id.*). At no time during the encounter did Lieutenant Brown hit, injure, or threaten Golatt with physical force, and he did not see any of the other officers take these actions. (*Id.*).

8

In addition to their affidavits, the officers filed an audio recording made during the events at the apartment on July 25, 2016. (Dkt. 59-5). Throughout the audio, Golatt and the officers spoke in a very conversational manner. The audio, which contains no gaps or breaks, did not record any threats, coercion, or intimidation by any of the officers either at the door to the apartment or once inside.

The recording starts shortly before Golatt and the officers reach the door of the apartment. At that time, Sergeant Tryon said, "I appreciate you letting us in and getting this taken care of." (*Id.* at 1:03-1:06). One minute later, Golatt said, "Now I'm letting y'all in there. You know that, right?" (*Id.* at 02:06-02:11).

Once inside, Golatt told the officers that Lee and a woman dropped a bag off at the apartment the night before, and they were supposed to return with beer. (*Id.* at 01:38-01:50, 3:18-3:31). The woman brought a gun, which she also left in the apartment. (*Id.* at 01:09-01:15). Golatt claimed that he did not know what was in the bag; he just took it and went to bed. (*Id.* at 00:24-00:27). Golatt admitted that Lee paid him to hold things for him. (*Id.* at 05:18-5:50).

Shortly thereafter, the officers found some cash in the apartment. (*Id.* at 06:14). Golatt identified the cash as his rent money and said that it was about $190. (*Id.* at 06:18-06:40). The officers later found approximately $3,000 that Golatt said was money he was saving from work and that he intended to use it to purchase a car.

9

(*Id.* at 09:49-10:09, 21:58). Golatt said that a man up the street had agreed to sell him a small Toyota for $3,200. (*Id.* at 22:02-22:29). A few minutes later, the officers found cash inside the bag left by Lee, and Golatt told the officers that that cash was not his but must be Lee's. (*Id.* at 24:10-24:25).

While the officers were in the apartment, Golatt first told them that his mother lived there but that she was currently in Louisiana. (*Id.* at 04:15). When the officers did not find any women's clothing in the apartment and saw only one bed in the bedroom, Golatt told them that his mother's name was on the lease, but she did not like staying there because some of the neighbors smoked drugs that made the apartment smell. (*Id.* at 08:58-09:47, 13:58-14:20, 18:05). Golatt later stated that his mother was not currently living there; she was staying with a friend who was dying. (*Id.* at 18:30-19:34).

After recovering the bag left by Lee, the gun left by Vasquez, and the cash, the officers asked Golatt to sign a consent-to-search form. (*Id.* at 19:41). When presented with the form, Golatt reminded the officers that he initially voluntarily let them inside. (*Id.* at 19:45-19:47). But he refused to sign the consent form, saying he did not think that he should sign without his lawyer seeing it first. (*Id.* at 25:09-25:23). Golatt assured the officers that he would sign the form once his lawyer read it to him. (*Id.* at 25:23-25:48). Nowhere on the recording does Golatt refuse to sign

the form because the search is illegal, and nowhere does Sergeant Tryon try to coerce Golatt into signing the form with promises of leniency.

While the officers were in the apartment, Lieutenant Brown commented that Golatt had let them in voluntarily. (*Id.* at 13:18-13:19). Detective Moore also noted that Golatt was not in handcuffs. (*Id.* at 14:52). Sergeant Tyron told the Assistant District Attorney during a phone call that Golatt was "not even in custody right now." (*Id.* at 35:33-35:38). Based on this evidence, the officers argue that there is no evidence to support Golatt's claims of an illegal arrest, an illegal search, the use of excessive force, or the theft of any cash.

In Golatt's sworn response to the motion, he again asserts that he was illegally detained, subjected to excessive force, and then falsely arrested after an illegal search. (Dkt. 68, p. 3). He alleges that he was illegally detained while he was walking to Starbuck's and that he was handcuffed and driven to his mother's apartment, where he was coerced into giving the officers consent to enter. (*Id.* at 3-4). He asserts that he did not consent to the entry or the search because he had "no legal standing" to do so. (*Id.* at 8). He also alleges that the apartment was searched without a warrant and that he was arrested without probable cause. (*Id.* at 4). Golatt offers no evidence, other than his own statements, to support his claims.

In their reply, the officers contend that Golatt was not arrested on the street

and that they had the reasonable suspicion necessary to temporarily detain him based on the information provided by Vasquez. (Dkt. 69, p. 1). They allege that there is no evidence from any party, including Golatt, showing that excessive force was used at any time. (*Id.* at 2). They assert that Golatt's allegation that he did not consent to the officers' entry into the apartment is conclusory and contradicted by the audio recording. (*Id.*). Finally, they contend that there is no evidence that any money belonging to Golatt was taken, other than the $3476.01 that was the subject of state-court forfeiture proceedings.

## II.   LEGAL STANDARDS

### A.   Actions Under 42 U.S.C. § 1983

Golatt filed his complaint against the officers under 42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but instead was designed to provide a remedy for violations of statutory and constitutional rights." *Lafleur v. Texas Dep't of Health*, 126 F.3d 758, 759 (5th Cir. 1997) (per curiam); *see also Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To state a valid claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Gomez v Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (per curiam).

12

The dispute in this case focuses on the first element: whether the officers violated Golatt's constitutional rights.

### B.   Summary-Judgment Standard

The officers have filed a motion for summary judgment. "Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton,* 572 U.S. 650, 656-57 (2014) (per curiam) (quoting FED. R. CIV. P. 56(a)). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-25 (1986)). "A fact is material if its resolution could affect the outcome of the action." *Dyer v. Houston,* 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.,* 627 F.3d 134, 134 (5th Cir. 2010)). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Westfall v. Luna,* 903 F.3d 534, 546 (5th Cir. 2018) (per curiam) (cleaned up).

When considering a motion for summary judgment, the Court must view all evidence and draw all inferences "in the light most favorable to the [nonmoving] party." *Tolan,* 572 U.S. at 657 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144,

157 (1970)); *see also Dyer*, 964 F.3d at 380. However, if record evidence clearly contradicts the plaintiff's version of events, the Court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Waddleton v. Rodriguez*, 750 F. App'x 248, 253-54 (5th Cir. 2018) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). This is particularly true when there is audio or video evidence. When "there is a video and audio recording of the event, we are not required to accept factual allegations that are 'blatantly contradicted by the record.'" *Tucker v. City of Shreveport*, 998 F.3d 165, 170 (5th Cir.) (quoting *Scott*, 550 U.S. at 380), *cert. denied sub nom. Tucker v. City of Shreveport, La.*, 142 S. Ct. 419 (2021). Instead, when there is audio or video evidence and when a party's version of the facts conflicts with that evidence, the Court will "consider the facts 'in the light depicted by the videotape.'" *Brown v. Lynch,* 524 F. App'x 69, 73-74 (5th Cir. 2013) (per curiam); *see also Lewis v. City of Shreveport,* 765 F. App'x 93, 94 (5th Cir. 2019) (per curiam) (applying *Scott* to a case involving audio evidence and finding that because the audio evidence contradicted the plaintiff's claim that he complied with arresting officers, the court had to conclude that the plaintiff resisted arrest); *Westfall,* 903 F.3d at 543-44 (affirming the district's court's reliance on audio recordings taken during an arrest to determine that the officers had probable cause to arrest the plaintiff and to rebut his claim of false arrest); *Widder v. Tex.*

14

*A&M Univ.—Corpus Christi*, No. 2:11-cv-282, 2012 WL 3776480, at *5 (S.D. Tex. July 31, 2012) (rejecting plaintiffs' "self-serving deposition testimony" that was clearly contradicted by audiotaped evidence); *Harris v. Bosque Cnty., Tex.,* Civil No. W-15-CV-161, 2016 WL 8904946, at *3 (W.D. Tex. Apr. 27, 2016) (holding that the rule concerning viewing evidence in the light depicted by the videotape applies equally when an audio recording of the scene is in evidence).   In addition, the Court will not consider the nonmoving party's conclusory allegations and unsubstantiated assertions as evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

### C.   *Pro Se* Pleadings

Because Golatt is representing himself, the Court construes his filings liberally, subjecting them to "less stringent standards than formal pleadings drafted by lawyers[.]" *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam).   But even under this lenient standard, self-represented litigants must still "abide by the rules that govern the federal courts." *E.E.O.C. v. Simbaki, Ltd*., 767 F.3d 475, 484 (5th Cir. 2014) (quoting *Frazier v. Wells Fargo Bank, N.A*., 541 F. App'x 419, 421 (5th Cir. 2013)).   "*Pro se* litigants must properly plead sufficient facts that, when liberally construed, state a plausible claim to relief, serve defendants, obey discovery orders, present summary judgment evidence, file a notice of appeal, and brief arguments on

15

appeal." *Id.* (footnotes omitted).

## III.   DISCUSSION

### A.   False Arrest Claim

Golatt argues that he was illegally detained on the sidewalk and then falsely arrested. The officers assert that the encounter on the sidewalk was a consensual encounter and that they did not arrest Golatt until after they entered the apartment when probable cause had arisen. Alternatively, the officers assert that even if the arrest was improper, they are entitled to qualified immunity.

To prevail on a claim of false arrest, a plaintiff must show that the officer or officers did not have probable cause to arrest him at the time the arrest was made. *See, e.g., Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206-07 (5th Cir. 2009); *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001). Probable cause exists "when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655-56 (5th Cir. 2004) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001) (cleaned up)). "If there was probable cause for any of the charges made . . . then the *arrest* was supported by probable cause, and the claim for false arrest fails." *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (per curiam) (quoting *Wells*

16

*v. Bonner,* 45 F.3d 90, 95 (5th Cir. 1995)).

In contrast to an arrest, an investigatory stop, or temporary detention, is authorized when it is "supported by a reasonable suspicion 'that the person apprehended is committing or has committed a criminal offense.'" *United States v. Thomas*, 997 F.3d 603, 609 (5th Cir. 2021) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)), *cert. denied*, 142 S. Ct. 828 (2022). The reasonable suspicion necessary to support an investigatory stop "exists if the officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* at 610 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "This standard is met if "specific and articulable facts" give rise to a suspicion that the person stopped 'has committed, is committing, or is about to commit a crime.'" *Id.* (quoting *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017)). The determination of whether a particular encounter is an arrest or merely a detention turns on "the reasonableness of the intrusion under all the facts." *United States v. Martinez,* 808 F.2d 1050, 1053 (5th Cir. 1987) (cleaned up).

Even when the police intend only to detain a person, that detention may be converted into an arrest if "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Turner v. Lieutenant Driver*,

17

848 F.3d 678, 692-93 (5th Cir. 2017) (quoting *Carroll v. Ellington*, 800 F.3d 154, 170 (5th Cir. 2015)). But "[u]sing some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect . . . do not automatically convert an investigatory detention into an arrest requiring probable cause." *Id.* (quoting *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993)). To determine whether an investigatory detention has risen to the level of an arrest, "[t]he court must determine case by case whether the police were unreasonable in failing to use less intrusive procedures to conduct their investigation safely." *Sanders*, 994 F.2d at 206-07.

### 1.   Detention on the Sidewalk

Golatt first alleges that he was illegally detained on the sidewalk outside of the Starbuck's. The evidence before the Court concerning this initial encounter is disputed, with Golatt asserting that it was a detention and the officers asserting that it was a consensual encounter. Taking the evidence in the light most favorable to Golatt—as the Court must at this stage of the proceedings—compels the Court to conclude that the encounter rose to the level of a stop and detention. However, the evidence also shows that the officers had the reasonable suspicion necessary to support such a detention when it occurred.

Before the officers stopped Golatt, they had information indicating that that

18

Lee, a known drug dealer, was using the apartment where Golatt was staying as a stash house.    An informant had provided details about the apartment and a description of the person staying there.   The officers put the apartment under surveillance, and Detective Moore saw a man matching the description given by the informant leave the apartment where the drugs were said to be kept.  These specific facts were sufficient to give Detective Moore had a "particularized and objective basis" for suspecting that the man leaving the apartment—who turned out to be Golatt—was engaged in criminal activity and so provided the reasonable suspicion necessary to support a temporary detention.  Under these circumstances, detaining Golatt to investigate further was reasonable and did not constitute an illegal detention.

Golatt does not challenge any of this evidence supporting his detention. Instead, he alleges that Lieutenant Brown put a hand on Golatt's chest and ordered him to talk to the officers, while also placing a hand on his holstered firearm.  Golatt seems to contend that these actions turned the detention into an arrest.  But even taking Golatt's allegations as true, Lieutenant Brown's actions are not sufficient to convert Golatt's detention into an arrest.  *See Turner*, 848 F.3d at 692-93 (permitting the use of some force during an investigatory detention).   Since Golatt alleges that he did not want to stop and speak with the officers, Lieutenant Brown's nonviolent

actions taken to ensure Golatt's compliance with the order to stop were not unreasonable under the circumstances, and they did not convert a lawful detention into an illegal arrest.

The evidence before the Court, taken in the light most favorable to Golatt, shows that the officers had the reasonable suspicion necessary to support Golatt's temporary detention on the sidewalk outside Starbuck's. Golatt has not pointed to evidence sufficient to create a genuine issue of material fact as to whether a reasonable suspicion existed for the detention or whether the legal detention was converted into an illegal arrest during the stop. To the extent that Golatt's claim of an illegal detention or false arrest is based on the encounter on the sidewalk, he has failed to carry his burden to show that genuine issues of material fact exist concerning whether the officers' conduct violated his constitutional rights. The officers are entitled to summary judgment in their favor on this claim.

### 2. Handcuffing in the Police Vehicle

Golatt also alleges that the officers placed him under arrest when they handcuffed him before putting him in the police vehicle to return to the apartment. The evidence is disputed as to whether Golatt was handcuffed when he rode back to the apartment in Lieutenant Brown's police vehicle, with Golatt saying he was and the officers saying he was not. Taking the evidence in the light most favorable to

20

Golatt compels the Court to assume that Golatt was handcuffed. However, even if the officers handcuffed Golatt for this short ride, this single action did not transform his otherwise lawful detention into an illegal arrest.

The Fifth Circuit has held that "using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause." *Sanders,* 994 F.2d at 206. In addition, police officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Henley*, 469 U.S. 221, 235 (1985). This may include temporarily handcuffing an individual during a detention. *See, e.g., United States v. Coulter*, 41 F.4th 451, 460 (5th Cir. 2022) (holding that objective concerns for officer safety may necessitate the use of handcuffs during a temporary detention); *United States v. Jordan*, 232 F.3d 447, 449-50 (5th Cir. 2000) ("This court has held that, after making a proper *Terry*[2] stop, the police are within their constitutional authority to pat down a party and to handcuff him for their personal safety even if probable cause to arrest is lacking."); *United States v. Campbell,* 178 F.3d 345, 349-50 (5th Cir. 1999) (holding that an investigatory

---

[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

detention of a suspect during which the police officer drew his weapon, ordered the

suspect to lie on ground, handcuffed him, and frisked him did not amount to arrest);

*see also United States v. Bennett,* 329 F.3d 769, 774 (10th Cir. 2003) ("Police may

use firearms and handcuffs as part of a permissible detention when they reasonably

believe it is necessary for their safety and protection."). The relevant question is

whether the police acted unreasonably "in failing to use less intrusive procedures to

conduct their investigation safely." *Sanders,* 994 F.2d at 206-07.

The evidence before the Court shows that Golatt agreed to accompany the

officers back to the apartment where he was staying so they could retrieve the bag

that Lee left there the night before.[3] The officers asked Golatt whether he wanted to

walk or ride back to the apartment, and Golatt said he would ride. While there is

nothing in the record indicating that Golatt may have been armed, it was not

unreasonable under the circumstances for the officers to briefly handcuff Golatt to

ensure their safety during the short ride back to the apartment. This limited use of

handcuffs, which Golatt admits secured his hands in front of him, was not

disproportionate to the potential threat to officer safety and did not turn an otherwise

---

[3]In his complaint, Golatt alleges that he did not want to return to the apartment but
wanted to continue on his way to Starbuck's. He alleges that he was forced into the police
vehicle and forced to return to the apartment. But these facts are contradicted by the
evidence on the audio recording filed in support of the officers' motion for summary
judgment. The Court is not required to accept Golatt's version of events that is contradicted
by the audio recording of the events.

proper detention into an illegal arrest. *See, e.g., Jordan*, 232 F.3d at 450 ("Handcuffing a suspect does not automatically convert an investigatory detention into an arrest requiring probable cause" (quoting *Sanders*, 994 F.2d at 206)).

Golatt has pointed to no evidence sufficient to create a genuine issue of material fact as to whether the officers acted unreasonably by handcuffing him for officer safety during his brief ride in the police vehicle. To the extent that Golatt's claim of an illegal arrest is based on this brief use of handcuffs, he has failed to carry his burden to show that genuine issues of material fact exist concerning whether the officers' conduct violated his constitutional rights. The officers are entitled to summary judgment on this claim.

### 3. Arrest in the Apartment

Alternatively, Golatt argues that his arrest inside the apartment was illegal because it was made without probable cause. But the undisputed facts show that the officers had probable cause to arrest Golatt once they were inside the apartment, so he has not met his burden to show that the arrest was illegal.

A warrantless arrest is lawful when it is based on probable cause. "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v.*

*McCowan*, 469 F.3d 386, 390 (5th Cir. 2006) (quoting *United States v. Ramirez*, 145 F.3d 345, 352 (5th Cir. 1998)).

When the officers arrested Golatt inside his apartment, they had the following information: (1) Lee—a known drug dealer—had been inside Golatt's apartment the night before and had obtained drugs there; (2) Vasquez—Lee's codefendant— described Golatt's apartment as one of Lee's stash houses; (3) Vasquez accurately described the location and condition of the apartment, and she described the occupant of the apartment; (4) Golatt matched the description of the occupant given by Vasquez; (5) Golatt was in possession of a bag that contained large amounts of numerous controlled substances; (7) Golatt—a convicted felon—was in possession of a handgun; and (8) Golatt accepted payments from Lee in exchange for holding items for Lee. While Golatt disputed his possession of the bag and gun—telling the officers that they were not his but instead were Lee's—the totality of the facts and circumstances were sufficient for a reasonable officer to conclude that Golatt had committed and was committing the offenses of possession of controlled substances and possession of a firearm by a convicted felon. Based on this evidence, Golatt's arrest inside the apartment was supported by probable cause.

Golatt does not dispute any of the facts giving rise to probable cause for his arrest, and he has not pointed to evidence sufficient to create a genuine issue of

24

material fact as to whether the officers had probable cause to arrest him after he allowed them into the apartment.  To the extent that Golatt's claim of an illegal arrest is based on a claim of a lack of probable cause, he has failed to carry his burden to show that genuine issues of material fact exist concerning whether the officers' conduct violated his constitutional rights.  The officers are entitled to summary judgment on this claim.

### 4.   **Qualified Immunity**

While the Court does not find that genuine issues of material fact exist concerning whether Golatt's detention and arrest were legal, even if this Court were to conclude that that Golatt's constitutional rights were violated during his detention and arrest, the Court would find that the officers were entitled to qualified immunity.

"Qualified immunity protects government officials . . . from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (per curiam).  Once the defense of qualified immunity is raised, "the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Club Retro*, 568 F.3d at 194.  In the context of a motion for summary judgment, this requires the plaintiff to "(1) raise a fact dispute on whether his constitutional rights were violated by the defendants' individual conduct, and (2) show that the rights

were 'clearly established at the time of the violation." *Rogers v. Jarrett*, No. 21-20200, 2023 WL 2706752, at \*2 (5th Cir. Mar. 30, 2023) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). If the plaintiff shows that his constitutional rights were violated, the remaining question for the Court "is[] whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Therefore, if "reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity." *Haggerty*, 391 F.3d at 655 (quoting *Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 550 (5th Cir. 1997)).

There is no question that it was clearly established in July 2016 that "[a]n arrest is unlawful unless it is supported by probable cause." *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004). Therefore, the officers are entitled to qualified immunity from Golatt's false arrest claim only if reasonable officers in their positions could have believed that, given the totality of the facts and circumstances of which they were aware, there was a fair probability that Golatt had committed or was committing an offense. *See Glenn*, 242 F.3d at 313. Because the standard is only one of a fair probability, law enforcement officers who reasonably but mistakenly believe that probable cause exists are entitled to qualified immunity.

26

*See Haggerty*, 391 F.3d at 656 (quoting *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000)); *see also Petersen v. Johnson*, 57 F.4th 225, 232 (5th Cir. 2023) ("Actual probable cause is not necessary; merely *arguable* probable cause is sufficient to trigger qualified immunity." (citing *Club Retro*, 568 F.3d at 207 ("[P]laintiffs must allege facts permitting an inference that defendants lacked arguable (that is, reasonable but mistaken) probable cause for the arrests."))).

As explained above, the summary judgment evidence shows that the officers had information tending to show that illegal drug activity was occurring in the apartment where Golatt was staying. Golatt consented to the officers entering the apartment, and, once inside, the officers determined that Golatt was illegally in possession of a firearm and a bag containing a significant quantity of illegal drugs. In view of these facts, a reasonable officer could have believed that there was a fair probability that Golatt had committed or was committing an offense. Golatt has not shown that disputed issues of material fact exist material to the question of whether there was at least arguable probable cause for his arrest. The officers are therefore entitled to summary judgment in their favor on the basis of qualified immunity, and Golatt's false arrest claim is denied.

### B.   Excessive Force Claim

In his second claim, Golatt alleges that Sergeant Tryon used excessive force

27

against him during the ride from the Starbuck's back to the apartment. Arrestees like Golatt have the right under the Fourth Amendment to be free from the use of excessive force. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). To prevail on a Fourth Amendment excessive force claim, the plaintiff must establish that he suffered an "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017); *see also Flores*, 381 F.3d at 396. Whether the use of force is unreasonable "turns on the 'facts and circumstances of each particular case,'" and the Court considers reasonableness from the perspective of a reasonable officer. *Graham*, 490 U.S. at 396. In making this determination, the Court looks only at the objective reasonableness of the force used rather than any underlying intent or motivation on the part of the officers. *Id.* at 397.

The only use of force mentioned in Golatt's amended/supplemental complaint is his allegation that Sergeant Tryon put his hands around Golatt's neck and threatened him with harm if he did not consent to the officers' entry into the apartment. While Sergeant Tryon disputes that this occurred, the Court must view the evidence in the light most favorable to Golatt at this stage of the proceedings. However, even considered in that light, Golatt neither alleges that he suffered any injury, nor does he point to any evidence showing a disputed issue of fact as to

whether he suffered an injury. He alleges only threats of violence, which do not rise to the level of a constitutional violation. *See, e.g., McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983). Because Golatt offers no evidence raising a disputed issue of material fact as to whether he suffered an injury from the allegedly excessive force, he has failed to carry his burden of proof. Sergeant Tryon is entitled to summary judgment in his favor on this claim, and Golatt's excessive force claim is denied.

## C.   Illegal Search Claim

In his third claim, Golatt alleges that the officers violated his Fourth Amendment rights by searching the apartment where he was staying without either consent or a warrant. Golatt primarily alleges that he could not consent to the search because the apartment was his mother's and so he had no authority to give consent. Alternatively, he alleges that any consent he gave was not voluntary. Neither argument entitles him to relief.

### 1.   Lack of Authority to Consent

Golatt first alleges that he had no authority to consent to a search of the apartment because it was his mother's apartment. He contends that because the lease was not in his name, any consent he gave was invalid. But even taking Golatt's allegations about the lease as true, the undisputed facts show that he had at least the

apparent authority to consent to the search.

When the government seeks to justify a warrantless search on the theory that a third party, rather than the property owner, provided lawful consent, the government must prove that the third party had *either* the actual or apparent authority to consent. *See United States v. Jaras,* 86 F.3d 383, 389 (5th Cir. 1996) (citing *Illinois v. Rodriguez,* 497 U.S. 177, 186-87 (1990)).  To establish that a third party had actual authority to consent, the government must show that the third party "mutually used the property searched and had joint access to and control of it for most purposes." *Id.* (quoting *United States v. Rizk,* 842 F.2d 111, 112-13 (5th Cir. 1988) (per curiam)).  To establish that a third party had apparent authority to consent, however, the government need only show that the officers "'reasonably (though erroneously) believe[d] that the person who has consented to their' search had authority to do so." *Id.* (quoting *Rodriguez,* 497 U.S. at 188).

In his amended/supplemental complaint, Golatt alleges that he had no actual authority to consent to a search of the apartment because it was not his apartment. However, the audio recording captured Golatt clearly confirming for the police that he was voluntarily allowing them to enter the apartment.  And the undisputed evidence establishes that Golatt unlocked the apartment with a key that was in his possession, his personal effects were in the apartment, and he told the officers that

he was staying in the apartment while his mother was away.  The Court need not accept Golatt's current allegation of a lack of authority to consent when that allegation clearly conflicts with the audio evidence, and his use of a key and statements concerning control of the apartment are sufficient to show that he had the actual authority to consent to the search.  Moreover, even if Golatt did not have the actual authority to consent to the search, these facts are sufficient to show that it was reasonable for the officers to believe that he had apparent authority to consent.

Golatt does not point to any evidence sufficient to raise a genuine issue of material fact as to whether the search was conducted with either his actual or apparent consent.  He has therefore not carried his burden of proof to show that the officers violated his constitutional rights, and he may not avoid summary judgment on this basis.

### 2.   Involuntary Consent

In the alternative, Golatt alleges that his consent was involuntary because it was the product of threats and coercion.  The Supreme Court has held that when "the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973).  Voluntariness is a question

of fact to be determined from all the circumstances. *Id.* at 248-49. When reviewing the question of voluntariness, courts consider six factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005) (quoting *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002)).

The summary judgment evidence, taken in the light most favorable to Golatt except as contradicted by the audio recording, shows that Golatt agreed to allow the officers into the apartment where he was staying because he wanted to disclaim ownership and possession of drugs and a firearm left in the apartment by Lee. While the officers were in the apartment, they asked for consent to search the room where the bag was found, and Golatt agreed. However, when the officers repeatedly asked Golatt for consent to search his phone, Golatt refused to permit that search. Throughout the time when the officers were in the apartment, the tone of their conversation with Golatt was conversational, cooperative, and amicable, and no threats or coercive statements were made. The audio recording shows that Golatt was aware of what was happening and aware of his rights concerning the search.

32

This evidence, considered as a whole, refutes Golatt's claim that he did not voluntarily consent to the search of the apartment. While Golatt alleges that Sergeant Tryon coerced and intimidated him into consenting, Golatt points to no evidence other than his own self-serving assertions in support of this claim. Golatt's claim of coercion conflicts with the evidence captured on the audio recording, which shows a friendly and conversational tone and does not support Golatt's allegations that he attempted to refuse the officers entry into the apartment and that he told the officers that the search was "illegal." Moreover, the fact that Golatt repeatedly refused to permit the officers to search his phone tends to show that he was not intimidated by the officers and that he understood that he could limit the scope of the search if he so chose.

Golatt has not directed the Court's attention to evidence sufficient to raise a genuine issue of material fact on the issue of whether the consent he gave to the officers was voluntary, and therefore the officers are entitled to summary judgment in their favor on this claim.

### 3. Lack of Injury

Even if Golatt had alleged facts sufficient to raise genuine issues of material fact as to whether the search of the apartment was illegal, he would nevertheless not be entitled to relief because he has not alleged facts showing the necessary injury.

The Fifth Circuit does not appear to have clearly addressed the question of whether an arrestee may be awarded damages for a lawful arrest that arises from an unlawful search. *See, e.g., Thompson v. Link*, No. 19-cv-0252, 2019 WL 2397641, at *3-4 (W.D. La. June 4, 2019) (collecting cases).   Other courts, however, have concluded that damages are not available under those circumstances.   *See, e.g., Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir 1999); *Hector v. Watt*, 235 F.3d 154, 157 (3d Cir. 2000); *Davis v. Cedar Hill Police Dep't*, No. 3:17-cv-278-M-BN, 2018 WL 1633023, at *8 (N.D. Tex. Mar. 9, 2018).   Instead, to be entitled to damages, Golatt must show that he was harmed by the illegal search in some way *other than* by the arrest and criminal prosecution that was later dismissed.   *See Heck v. Humphrey*, 512 U.S. 477, 487 n.7 (1994) ("In order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury, which, we hold today, does not encompass the "injury" of being convicted and imprisoned." (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986))); *see also Silver v. D.C. Metro. Police Dep't*, 939 F. Supp. 2d 20, 22-23 (D.D.C. 2013) (holding that the plaintiff was not entitled to compensation based on the stress, trouble, and pain caused by his legal arrest that followed an illegal search).

Golatt does not allege facts showing that he suffered any injury because of the

34

allegedly illegal search other than his legal arrest and resulting incarceration. In the absence of evidence of some independent injury, Golatt is not entitled to relief on his claim based on an illegal search. The officers are entitled to summary judgment in their favor on this claim.

### D.    **Stolen Money Claim**

In his final claim, Golatt alleges that the officers stole $10,000 in cash belonging to him during the search of the apartment. The officers admit that they confiscated $3476.01 in cash and turned it over to the District Attorney for forfeiture proceedings, but they deny seizing any other cash. However, even taking Golatt's allegations as true, he is not entitled to relief under § 1983 at this time because he has not exhausted his available state-law remedies.

While the Fourteenth Amendment to the Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law," theft of property by a state employee violates the Fourteenth Amendment only if no meaningful post-deprivation remedy for the loss exists. *See Hudson v. Palmer,* 468 U.S. 517, 533 (1984). When a state-law post-deprivation remedy exists, a plaintiff may bring suit in federal court for the theft only after he first pursues the state-law remedy and only if relief is denied on grounds other than the merits of his claim. *See Thompson v. Steele,* 709 F.2d 381, 383 n.3 (5th Cir. 1983).

In his complaint, Golatt alleges that the officers stole $10,000 in cash from the apartment. Even if this allegation were true—a finding the Court does not make—this theft standing alone is not a constitutional violation. Texas law provides a post-deprivation remedy for thefts by state government officials. *See Murphy v. Collins,* 26 F.3d 541, 543 (5th Cir. 1994) ("In Texas . . . the tort of conversion fulfills [the post-deprivation remedy] requirement."). And because a post-deprivation state-law remedy exists, Golatt must first pursue that remedy before seeking relief in federal court. But Golatt does not allege, and the evidence before the Court does not show, that he has pursued that available remedy. Because he has not done so, his action under § 1983 is premature. If Golatt elects to pursue the available state-law remedy, and if the state court denies relief for any reason other than the lack of merit of his claim, Golatt may once again seek relief on this claim under § 1983. *See Loftin v. Thomas,* 681 F.2d 364, 365 (5th Cir. 1982).

## IV. <u>CONCLUSION</u>

Based on the above, the Court **ORDERS** as follows:

1. The officers' motion for summary judgment, (Dkt. 59), is **GRANTED**.

2. Golatt's "Motion to Deny Defendants' Motion for Summary Judgment," (Dkt. 68), is **DENIED**.

3. The action against the defendants is **DISMISSED** with prejudice as to all

claims except the claim for theft of cash, which is **DISMISSED** without prejudice.

4. All pending motions are **DENIED as moot**.

The Clerk will provide a copy of this Order to the parties.

SIGNED at Houston, Texas, on _____, 2023.


DAVID HITTNER
UNITED STATES DISTRICT JUDGE